# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 18-0226V
UNPUBLISHED

|  |  |
|---|---|
| KIMBERLY RAYBORN,<br><br>              Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>            Respondent. | Chief Special Master Corcoran<br><br>Filed: August 14, 2020<br><br>Special Processing Unit (SPU); Ruling on Entitlement; Table Injury; Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for petitioner.*

*Ryan Daniel Pyles, U.S. Department of Justice, Washington, DC, for respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On February 14, 2018, Kimberly Rayborn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on September 21, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to compensation in this case, and award of damages in the amount **$55,619.60**, **representing**

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**compensation in the amount of $55,000.00 for actual pain and suffering, and
$619.60 for past unreimbursable expenses.**

### I. Relevant Procedural History

On February 14, 2018, in addition to the petition, Petitioner filed medical records
as Exhibits 1-3 and an affidavit as Exhibit 4. (ECF No. 1). On February 20, 2018, Petitioner
filed the vaccine administration record as Exhibit 5 and, on February 26, 2018, filed a
statement of completion. (ECF Nos. 6, 8). Immediately following the March 20, 2018 initial
status conference, Petitioner filed additional medical records as Exhibits 6 and 7. (ECF
No. 10). On April 10, 2018, Petitioner filed an amended petition in which the date of
vaccination was corrected. (ECF No. 11). Petitioner's second affidavit and a more detailed
record of vaccine administration were filed on April 13 and April 23, 2018 as Exhibits 8
and 9. (ECF Nos. 13, 14).

On November 14, 2018, Respondent filed the Rule 4(c) Report asserting that
Petitioner had not demonstrated entitlement to compensation. Respondent's Report (ECF
No. 23). Specifically, Respondent argued that the record is insufficient to substantiate that
the onset of Petitioner's left shoulder symptoms began within forty-eight hours of
vaccination because "petitioner did not seek care for her alleged injury until . . . almost
four months after the vaccination." *Id.* at 3.

On November 20, 2018, the undersigned ordered Petitioner to file a detailed
affidavit and Motion for a Ruling on the Record regarding onset. *See* Scheduling Order at
1 (ECF No. 24). Petitioner filed her Motion on January 14, 2019 without an affidavit. (ECF
No. 25). Respondent filed his response on March 5, 2019. (ECF No. 26).

On June 7, 2019, then Chief Special Master Dorsey issued findings of fact and
conclusions of law finding that the record established that the onset of Petitioner's left
shoulder pain was within 48 hours of her September 21, 2016 flu vaccination (ECF No.
27). The parties then attempted informal settlement. *Id.*

On October 16, 2019, Petitioner filed a joint status report stating that the parties'
negotiations had reached an impasse (ECF No. 37). Petitioner stated that the parties
were amenable to a decision on the written record and proposed a briefing schedule. On
December 27, 2019, Petitioner filed a damages brief (ECF No. 41). Respondent filed his
damages brief on February 11, 2020 (ECF No. 45).

## II. Relevant Factual History

### A. Medical Records

On September 21, 2016, Petitioner received a flu vaccination in her left arm at Memorial Hospital in Gulfport, Mississippi. Ex. 9 at 1; Ex. 4 at ¶ 2. Petitioner's medical history does not appear to be contributory to her claim in this case. *See generally* Ex. 7 at 34-35 (listing Petitioner's past medical history and "active problems").

Approximately four months later, on January 18, 2017, Petitioner first presented to Nurse Practitioner ("NP") Anne Musgrove at Memorial Southern Coast Family Medicine with complaints of left shoulder pain. Ex. 3 at 4. According to the clinical record, Petitioner's pain "began in September on the evening she received her flu vaccine at work." *Id*. She reported that it became very uncomfortable to sleep on her left side. *Id*. The record indicates that Petitioner initially attempted to treat her shoulder with nonsteroidal anti-inflammatory drugs ("NSAIDs") and sought to alleviate pain through the strategic placement of pillows during the night and limiting weight-bearing activities. *Id*. Despite these measures, Petitioner's shoulder pain continued. *Id*.

NP Musgrove examined Petitioner's shoulder and found that "abduction of the left arm is limited to approximately 85 [degrees] actively and 94 [degrees] passively. There is some weakness in her left hand, sometimes losing her grip strength." *Id*. The clinical notes reflect "constant 2/10 dull aching with episodes of 6/10 pain with abduction of L[eft] arm." *Id*. Petitioner also exhibited mild bursal tenderness. *Id*. at 5. NP Musgrove diagnosed Petitioner with left shoulder pain and a vaccine reaction and referred her for magnetic resonance imaging ("MRI"). *Id*. at 5.

On January 22, 2017, Petitioner underwent an MRI of her left shoulder. Ex. 3 at 1-2.  The MRI report notes Petitioner's "[l]imited range of motion of the shoulder since the fluid [sic] shot." *Id*. at 1. The findings indicated that the "supraspinatus tendon demonstrates some mild internal signal alteration suggesting a mild degree of tendinosis." *Id*. The impression indicated the history of a flu shot injection and stated that the interpreting physician did "not see any evidence of an inflammatory process of the soft tissues of the left shoulder region. There is no evidence of abscess or septic arthritis or osteomyelitis. I do not see evidence of a rotator cuff tear or MRI evidence of impingement. There is noted to be some mild thickening of the joint capsule at the axillary recess which can be seen with adhesive capsulitis." *Id*.

On February 2, 2017, Petitioner presented to Dr. Arthur D. Black, an orthopedist. Ex. 6 at 1-2. Petitioner reported left shoulder pain "that started approximately 4 months ago after receiving a flu shot in the same shoulder." *Id*. at 1. She reported that initially she

had "significant pain with some decrease in her range of motion with reported tightness and exacerbation of pain with certain movements." *Id.* Petitioner further reported having had "some relief [of] some of the symptoms with activity modification and anti-inflammatories however they have not completely resolved." *Id.* She denied any numbness or paresthesias. *Id.* On examination, she was found to have full active and passive range of motion in her left shoulder. *Id.* Mild subacromial tenderness was noted. *Id.* She underwent left shoulder x-rays, which were normal. Ex. 3 at 3. Petitioner was assessed with "left shoulder bursitis, slow to resolve," and was given a cortisone injection. Ex. 6 at 2.

Petitioner returned to Dr. Black on March 21, 2017 to follow-up on her left shoulder pain.  Ex. 6 at 3-4. She reported improvement in her symptoms, noting that the cortisone injection provided good pain relief for approximately two weeks, but the pain was starting to return. *Id.* She was able to perform all of her daily activities, but was still having sleep disturbance due to pain. *Id.* On examination, her left shoulder had full range of motion with a mild arc of pain, tenderness over the lateral aspect of the shoulder, mild tenderness over the acromial clavicular joint, and mild weakness restricted by pain. *Id.* Petitioner was assessed with having left shoulder impingement symptoms and Petitioner was prescribed physical therapy.  *Id.* at 4.

On March 30, 2017, Petitioner underwent an occupational therapy ("OT") evaluation. Ex. 2 at 68-70. The record noted that she was a nurse practitioner with "a history of approximately 5 months of left shoulder pain which has kept her from performing recreational activities she enjoys such as tennis and water skiing. Her pain makes it difficult for her to sleep at night, and she has pain while at work." *Id.* She was found to have positive impingement signs with the Hawkins, Neer, and positive cross adduction tests. *Id.* at 69. In addition, she exhibited tenderness to palpation. *Id.*

Petitioner participated in 13 additional OT sessions from April 4, 2017 through May 18, 2017. Ex. 2 at 41-68. At her April 6, 2017 session, she was noted to have performed "all therapeutic exercises with good form and without discomfort" but also to demonstrate "tenderness with passive stretches." *Id.* at 65. The record of her April 11, 2017 session documented that she "complain[ed] of pain with activities behind her back, activities above her shoulders. Patient has been unable to engage in sports that [she] enjoys such as tennis and water skiing." *Id.* at 63.

The record of Petitioner's April 18, 2017 OT session states, "[p]t's pain is decreasing but she has a long work week m-f" and "[p]t states her shoulder already feels better." Ex. 2 at 59. At her April 27, 2017 visit it was noted that "[p]t had very tough work week and she is complaining of increased left shoulder pain." *Id.* at 54.

On April 21, 2017, Petitioner completed a Vaccine Adverse Event Reporting System form ("VAERS Report") indicating "left shoulder pain onset [illegible] injection." Ex. 1 at 2. The date of onset is listed as September 21, 2016. *Id.*

At Petitioner's final OT session on May 18, 2017, she was assessed as having deficits in activities of daily living, coordination, endurance, pain, proprioception, range of motion, and strength. Ex. 2 at 43. The record noted that he physician had discharged her from therapy and she was instructed on a home exercise and strengthening program. *Id.* Petitioner was thereafter formally discharged from OT on June 20, 2017. Ex. 2 at 40. Although it appears that she was not seen on this date, the record documents "dramatically lessened" pain of 1-2 with activity. *Id.* She was noted to demonstrate "excellent range of motion in all planes and 5 of 5 strength of her left shoulder." *Id.* She was independent with all ADLs and work care tasks. *Id.*

### B. Affidavit Evidence

Petitioner's second affidavit states that she began experiencing left shoulder pain following her September 21, 2016 flu shot. Ex. 8 at ¶ 3. Petitioner explained that, "[i]n the past with vaccination, I had often experienced some mild soreness typically resolving within a few days." *Id.* This time, however, the pain that followed her September 21, 2016 vaccination persisted. *Id.* Petitioner noted that as "a nurse practitioner and busy mom I continued to just treat supportively. Once I began having limited range of motion as well as continued pain, I knew there was something more wrong." *Id.*

Petitioner averred that she experienced pain in her shoulder almost daily for the prior 18 months. Ex. 8 at ¶ 7. As of the date of the affidavit, April 6, 2018, she averred that her pain level ranged between 1 and 3 depending on her daily activities. *Id.* She estimated that she missed approximately 16 days of work as a result of her injury. *Id.* at ¶ 8. After vaccination, she could not perform many non-work activities that she enjoyed before vaccination, such as water skiing, playing sports with her children, gardening, housecleaning, picking up her children or niece/nephews, driving long distances, and dressing and styling her hair. *Id.* at ¶ 10. She stated that day to day activities were "very difficult to accomplish with the pain and limited range of motion." *Id.*

Petitioner stated that she had largely returned to her previous state of health as of April 6, 2018. Ex. 8 at ¶ 11. She noted that she still experienced left shoulder discomfort on a daily basis, although she stated that if she maintains her home exercise program, the discomfort is manageable. *Id.* As of that date, she still experienced night time discomfort. *Id.* She believed she had achieved maximum improvement without pursuing surgery, which she did not want. *Id.*

### III. The Parties' Arguments

#### A. Petitioner's Position

Petitioner requests that I award damages in the amount of $85,619.60, comprising $85,000.00 for actual pain and suffering and $619.60 for out of pocket medical expenses. Petitioner's Brief ("Br.") at 8. Petitioner asserts that her left shoulder injuries are comparable to the injuries in *Attig*, *Kim*, and *Marino*.[3] *Id.* Petitioner emphasizes that she underwent a steroid injection, 13 occupational therapy sessions, an MRI, and visits to her primary care physician and an orthopedist. *Id.*

Petitioner compares the delay in seeking treatment in this case to that of the Petitioner in *Kim*. Br. at 8. As in *Kim*, Petitioner's MRI demonstrated a milder SIRVA, but the orthopedist here considered her pain severe enough to administer a steroid injection, which was not done in *Kim*. *Id.* at 8-9. Petitioner was also treated for nine months post-vaccination, at which point she reported a pain level of 1-2 with activity. *Id.* at 9. She compares this to the Petitioner in *Knauss*, who she states was 94% improved five months following vaccination. *Id.* And Petitioner experienced the loss of certain life pleasures similar to that in *Marino*. *Id.*

#### B. Respondent's Position

Respondent acknowledges the June 7, 2019 fact ruling concerning onset as law of the case, while reserving his right to appeal that ruling. Respondent's Brief ("Opp.") filed Feb. 11, 2020, at 1 n.1 (ECF No. 45). He asserts that a ruling finding entitlement to compensation based on a Table presumption of causation "cannot be sustained if the Ruling is vacated or overturned on appeal." *Id.* However, he raises no challenge to a ruling on entitlement in Petitioner's favor given the prior onset ruling. Respondent thus appears to recognize that an entitlement ruling in Petitioner's favor is warranted, using his brief to address the amount of damages rather than any entitlement issue. *Id.* To that end, Respondent advocates for a damages award in the amount of $30,619.60, consisting of $30,000.00 for actual pain and suffering, plus and $619.60 for past unreimbursed expenses (the same amount requested by Petitioner). Opp. at 1-2.

---

[3] *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses).

### 1. Continuum Methodology

With respect to damages, Respondent advocates for an award based on a continuum, where comparatively less is awarded to less severely injured Petitioners. Opp. at 4. Respondent acknowledges that this approach was called into question in *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579, 590 (2013). Nevertheless, Respondent states:

> Respondent agrees with *Graves* to the extent it calls for an individualized assessment of damages base on the specific facts of each case. However, to the extent *Graves* is interpreted to endorse a methodology that would result in the vast majority of Vaccine Act claimants recovering the statutory maximum amount for pain and suffering, respondent disagrees, because that is clearly inconsistent with the legislative history. Instead, respondent submits that the approach utilized by the Office of Special Masters for over two decades is consistent with Section 300aa-15(a)(4) and in keeping with how Congress intended the Vaccine Act to operate.

Opp. at 5.

### 2. Damages in this Case

Respondent argues that "petitioner's symptomatology is objectively demonstrated until her discharge from occupational therapy on June 20, 2017," reflecting a nine-month duration. Opp. at 11. Respondent asserts that "petitioner's symptomatology was not significant enough to prompt medical attention until approximately four months after vaccination." *Id.* at 12. Respondent characterizes the findings at that time as "objectively mild." *Id.* Respondent acknowledges that at a follow up visit approximately six weeks later, Petitioner reported that the relief obtained from a cortisone injection was fading. *Id.* Respondent asserts that overall, the intervention required for Petitioner's injury in this case was "minimal, consisting of two orthopedics visits, one cortisone injection, and thirteen therapy sessions." *Id.*

Respondent attaches to his brief a chart, Appendix A, which Respondent asserts includes the results of a Westlaw search of the Jury Verdicts and Settlements database for awards in cases involving shoulder impingement and shoulder bursitis. Opp. at 13. Respondent asserts that the average of the 55 awards listed in Appendix A is $33,089.33 and that 75% of the awards are for $30,000.00 or less. *Id.* Respondent asserts that all awards above $30,000.00 involve concurrent knee or back injuries. *Id.* Thus, Respondent argues, the pain and suffering award in this case should be limited to $30,000.00. *Id.*

**IV. Factual Findings and Ruling on Entitlement**

**A. Legal Standards**

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a Petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of Petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. § 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

*Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## B. Factual Findings Regarding QAI Criteria for Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

### 1. Prior Condition

The first QAI requirement for a Table SIRVA is lack of a history revealing problems associated with the affected shoulder which were experienced prior to vaccination and would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and I find that she has

demonstrated a lack of history of pain, inflammation, or dysfunction of her left shoulder that would explain her symptoms.  *See* Ex. 7 at 34-35.

### 2. Onset of Pain

Pursuant to Section 13(b)(2) of the Vaccine Act, a special master may find that the first symptom or manifestation of onset occurred within the time period set forth in the Table even if the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period.

The issue of onset has already been decided in Petitioner's favor in the June 7, 2019 fact ruling (ECF No. 27). Although Respondent states that he reserves the right to appeal the onset ruling, he has asserted no basis for my reconsideration of it, and I therefore adopt it in this Decision.

### 3. Scope of Pain and Limited ROM

Respondent has not contested that Petitioner meets this criterion. In addition, the medical records document symptoms only in Petitioner's left shoulder following her vaccine. Ex. 3 at 4-5; Ex. 6 at 1-4; Ex. 2 at 40-68. I thus find that Petitioner has demonstrated by a preponderance of the evidence that her pain and reduced range of motion were limited to the shoulder in which the intramuscular vaccine was administered.

### 4. Other Condition or Abnormality

The last QAI criteria for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). There is no evidence that Petitioner suffered any other condition which would explain her symptoms of pain and limited ROM in her left shoulder. Nor has Respondent identified any such other condition or abnormality. Accordingly, I find the record contains preponderant evidence establishing that there is no other condition or abnormality which would explain the symptoms of Petitioner's left shoulder injury.

### C. Other Conditions for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements. Petitioner meets the requirements for a Table SIRVA injury, as discussed above. In addition, the record supports the conclusion that Petitioner suffered the residual effects of her shoulder

injury for more than six months. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement); Ex. 6 at 34 (March 21, 2017 appointment with Dr. Black documenting the return of pain, assessing Petitioner with left shoulder impingement symptoms, resulting in a referral to physical therapy); Ex. 2 at 41-68 (records of 14 occupational therapy sessions between March 30, 2017 and May 18, 2017). I therefore find that Petitioner is entitled to compensation in this case.

## V. Appropriate Amount of Damages

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my

predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## B. Prior SIRVA Compensation

### 1. Overview of SIRVA Case Damages Outcomes in Settled Cases[6]

SIRVA cases have an extensive history of informal resolution within the SPU.  As of January 1, 2020, 1,405 SIRVA cases have informally resolved[7] since SPU's inception in July of 2014.  Of those cases, 817 resolved via the government's proffer on award of compensation, following a prior ruling that Petitioner is entitled to compensation.[8]

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[6] I used the term "settled" broadly, to include both cases that the Department of Justice resolves via litigative risk discussions and those it proffers (meaning the Government represents that the damages sum accurately reflects its liability under the Act in the relevant case). Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU. All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximate.

[7] Additionally, 41 claims alleging SIRVA have been dismissed within the SPU.

[8] Additionally, there have been 21 prior cases in which Petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

Additionally, 567 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,044.86 to $122,038.99.[9] The median award is $95,000.00. Formerly, these awards were presented by the parties as a total agreed-upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $92,500.00,[10] with a median award of $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of Petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## 2. Specific Prior Reasoned Decisions Addressing SIRVA Damages

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions awarding damages in SPU SIRVA cases – meaning where the parties were unable to informally resolve damages, so the dispute was adjudicated and ruled upon by a special master. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

### i. Below-median awards limited to past pain and suffering

In seventeen prior SPU cases, the Petitioner was awarded compensation for only actual or past pain and suffering in amounts below the median proffer figure discussed above, and in a range from $60,000.00 to $90,000.00.[11] These cases have all included

---

[9] Typical range refers to cases between the first and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 21 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[10] Typical range refers to cases between the first and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[11] These cases are: *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual

injuries with a "good" prognosis, although some of the Petitioners asserted residual pain. All of the Petitioners in such cases displayed only mild to moderate limitations in range of motion, and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. The duration of injury ranged from six to 29 months, with such petitioners averaging approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months. However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale. Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less. Slightly less than one-half of these individuals had been administered one to two cortisone injections. Most of these petitioners pursued physical therapy for two months or less, and none had any surgery. The petitioners in *Schandel, Garrett,* and *Weber* attended PT from almost four to five months, but most of the PT in *Weber* focused on conditions unrelated to the petitioner's SIRVA.   Several of these cases (*Goring, Lucarelli, Kent, Knauss*, *Marino*,

---

unreimbursable expenses); *Goring v. Sec'y of Health & Human Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) (awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursable expenses); *Lucarelli v. Sec'y of Health & Human Servs.*, No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursable expenses); *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy Petitioner's Medicaid lien); *Capasso v. Sec'y Health & Human Servs.*, No.17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursable expenses); *Schandel v. Sec'y of Health & Human Servs.*, No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursable expenses); *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for actual pain and suffering and $1,386.97 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

*Kim*, and *Dirksen*) included a delay in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

### ii. Above-median awards limited to past pain and suffering

In eight prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering but above the median proffered SIRVA award, in ranges from $110,000.00 to $160,000.00.[12] Like those in the preceding group, the relevant petitioner's prognosis was "good," but these higher award cases were characterized either by a longer duration of injury or by the need for surgical repair. Thus, seven out of eight underwent some form of shoulder surgery, while one (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, and also required extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings, with seven of eight showing possible evidence of partial tearing.[13] No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale, and all experienced moderate to severe limitations in range of motion. Moreover, these petitioners tended to seek treatment of their injuries

---

[12] These cases are: *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); *Kelley v. Sec'y of Health & Human Servs.*, No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); *Wallace v. Sec'y of Health & Human Servs.*, No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[13] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

more immediately (e.g., within five to 45 days from onset). Duration of physical therapy ranged from one to 28 months and six out of the eight had cortisone injections.

### iii. Awards including compensation for both past and future pain and suffering

In only three prior SPU SIRVA cases has a petitioner been awarded compensation for *both* past and future pain and suffering.[14] In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The *Hooper* petitioner underwent surgery, while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram. Despite significant physical therapy (and surgery in *Hooper*), medical opinions indicated that the relevant petitioner's disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies. In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis. These petitioners were awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

### C. Appropriate Compensation in this SIRVA Case

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the duration and severity of her injury.

#### 1. Duration

The medical records show that Petitioner suffered left shoulder pain and limited range of motion from September 2016 through at least June 2017, or for nine months. During this time, she self-treated with NSAIDs, consulted with her primary care provider

---

[14] These cases are: *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

and an orthopedist, received a cortisone injection, and underwent 14 OT sessions.

### 2. Severity

Petitioner is a health care professional and opted to self-treat her injury for approximately four months. When she did seek professional treatment, she reported pain that made it uncomfortable to sleep on her left side. She reported that she self-treated with NSAIDs, strategic placement of pillows at night, and limiting her activities. These measures were sufficient to prevent Petitioner from seeking medical care initially. She averred that when she began having limited range of motion as well as pain, she knew something was wrong and that is when she sought treatment. Ex. 8 at ¶ 3.

When she initially sought treatment on January 18, 2017, she reported constant pain levels of 2/10, with episodes of 6/10 pain with abduction of her left arm. Ex. 3 at 4. Abduction of her left arm was limited to approximately 85 degrees actively and 94 degrees passively.[15] *Id.* Petitioner's MRI showed evidence of mild tendinosis, but no evidence of a rotator cuff tear or impingement. Ex. 3 at 1-2. There were signs consistent with adhesive capsulitis. *Id.*

At Petitioner's first orthopedic appointment on February 2, 2017, the record reflects that she was found to have full active and passive range of motion in her left shoulder. Ex. 6 at 1. This is difficult to reconcile with the rather serious restrictions in range of motion in abduction documented on examination by her primary care provider two weeks earlier. Nevertheless, during the February 2, 2017 orthopedic visit, a cortisone injection was administered. *Id.* at 1-2. Thus, Petitioner was experiencing severe enough symptoms at this point to require treatment. While she received some relief from the cortisone injection, it faded relatively quickly and she then underwent 14 sessions of OT.

Overall, the record reflects that Petitioner exhibited mild to moderate symptoms for approximately nine months following vaccination.

### 3. Comparison to Other Awards

Petitioner compares her pain and suffering to that of the Petitioners in *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses), *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering

---

[15] Normal shoulder abduction for adults ranges from 170 to 180 degrees.  Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 80, 84 (F. A. Davis Co., 5th ed. 2016).

and $520.00 in unreimbursable medical expenses), and *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses).

However, I consider all three of these cases to have involved greater severity and/or duration than this case. At best, this case is similar to *Marino,* in that both Petitioners did not seek care for several months (underscoring the more mild impact of symptoms). Moreover, in *Marino* there was evidence showing that Petitioner's symptoms continued for over two and a half years after vaccination, significantly longer than in this case. *Marino* at *10. Thus, even *Marino* presents a somewhat high comparable.

*Kim* and *Attig,* by contrast, are far less persuasive comparable cases. In *Kim,* the Petitioner first sought treatment 42 days after vaccination – a third less time than Petitioner's first doctor's visit 119 days post-vaccination, thus further suggesting that Petitioner's pain was manageable. The *Attig* petitioner sought care even sooner (12 days post-vaccination), and also suffered an injury that was clearly more severe and of longer duration.

I find that the case most similar to this one is *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses). In *Knauss*, the petitioner did not seek treatment until 84 days after vaccination, which is somewhat sooner than Petitioner in this case, but comparable. The *Knauss* petitioner also suffered a relatively mild injury, and of a somewhat longer duration (approximately 12 months). Both Petitioners underwent one cortisone injection. The Petitioner in this case attended 14 OT sessions, while the Petitioner in *Knauss* attended 24 physical therapy sessions. Overall, I find these cases comparable, with *Knauss* suffering a slightly worse injury for a longer period of time.

## VI. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $55,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[16] **I also find that Petitioner is entitled to $619.60 in actual unreimbursable expenses.**

---

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $55,619.60 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[17]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.